## UNION CARBIDE CORPORATION *v.* CITY OF DANBURY (SC 16456)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 20—officially released September 4, 2001

*Elliott B. Pollack*, with whom was *Marjorie S. Wilder*, for the appellant (plaintiff).

*Daniel E. Casagrande*, with whom, on the brief, was *Kim E. Nolan*, for the appellee (defendant).

*Opinion*

ZARELLA, J. This is a tax appeal from the determination by the defendant, the city of Danbury, of the fair market value of certain of the plaintiff's real property, as of October 1, 1987. The plaintiff, Union Carbide Corporation, appealed to the defendant's board of assessment appeals (board) from the valuation of its property as of October 1, 1987. The board dismissed that appeal,

and the plaintiff appealed to the trial court pursuant to General Statutes § 12-117a.[1] The trial court rendered judgment dismissing the appeal, from which the plain-

[1] General Statutes § 12-117a provides: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment,

tiff appealed to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff claims, inter alia, that the trial court improperly: (1) relied on an agreement between the plaintiff and a real estate assessment firm hired by the defendant as to the value of the plaintiff's property; (2) accorded presumptive validity to the defendant's assessment; (3) relied on sale-leaseback market evidence to determine the value of the plaintiff's property; and (4) ruled on the admissibility of certain evidence. Because we conclude that the trial court properly determined that the plaintiff was estopped from seeking a reduction in the valuation of its property, it is not necessary to reach the remaining issues raised by the plaintiff's appeal. We, therefore, affirm the judgment of the trial court.

The property at issue in this case, which is located at 39 Old Ridgebury Road in Danbury, consists of a 1,308,721 square foot corporate headquarters building (building) and a 99.5 acre parcel of land on which the building is located. The building and 99.5 acre parcel are surrounded by 546 acres of undeveloped land.

The defendant conducted a revaluation of the plaintiff's property in 1987, and, on October 1, 1987, the building was valued at approximately $294,827,400 and the 99.5 acre parcel of land and a substantial portion of the undeveloped land, comprising a total of 626 acres, were valued at approximately $51,231,000, for a total valuation of approximately $346,058,400. The defendant's grand list of October 1, 1988, separated the unde-

enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

veloped land from the building and the 99.5 acre parcel, and placed the value of the building and 99.5 acre parcel at $306,803,857. Pursuant to General Statutes (Rev. to 1987) § 12-62a (b), the building and 99.5 acre parcel were assessed at a rate of 70 percent of that value, bringing the assessed value to about $214,762,700.

The defendant retained the firm of Cole, Layer and Trumbull (firm) to assist in the 1987 revaluation. Harold J. Maddocks, a senior commercial and industrial appraiser with the firm, supervised the revaluation. At the time of the revaluation, Maddocks had more than thirty years experience in the fields of assessment and appraisal, including the appraisal of facilities of large corporate headquarters.

At an October 22, 1987 meeting involving, among others, Maddocks and David Keating, the plaintiff's director of general services and manager of taxes, Maddocks and Keating agreed on a fair market value of between $350,000,000 and $355,000,000 for the building, 99.5 acre parcel and surrounding undeveloped land. Maddocks figured that his calculation would result in an annual tax savings of approximately $600,000 for the plaintiff.

Maddocks testified that, as a result of this agreement, Maddocks expressed to Keating that he would submit a figure of between $350,000,000 and $355,000,000 to the defendant for assessment purposes provided that the plaintiff understood, inter alia, that the agreed upon value would remain in effect throughout the period covered by the October 1, 1987 revaluation.

Maddocks was succeeded by Daniel Thomas in November, 1987, who issued an assessment notice to the plaintiff that allegedly set the value of the plaintiff's property higher than the value agreed upon by Maddocks and Keating at the October 22, 1987 meeting. After Keating contacted Thomas in December, 1987,

about the discrepancy and informed Thomas about his prior agreement with Maddocks, Thomas agreed to reduce the value of the plaintiff's property by approximately $10,000,000 for assessment purposes.

Before considering the merits of the parties' arguments, we set forth the basic legal principles and standard of review applicable to this appeal. "[I]n *Ireland* v. *Wethersfield*, 242 Conn. 550, 698 A.2d 888 (1997), we [set forth] the legal tenets governing tax appeals brought pursuant to § 12-117a . . . . [T]he trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . The trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value. . . . If the trial court finds that the taxpayer has failed to meet his burden because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone. . . . A taxpayer . . . who fails to carry [the burden of establishing overvaluation] has no right to complain if the trial court accords controlling weight to the assessor's valuation of his property." (Citations omitted; internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 117–18, 733 A.2d 817 (1999), quoting *Ireland* v. *Wethersfield*, supra, 556–59.

An appellate court's review of a trial court's decision is circumscribed by the appropriate standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made find-

ings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *DeSena* v. *Waterbury*, 249 Conn. 63, 72–73, 731 A.2d 733 (1999).

On the basis of the agreement between Keating and Maddocks, the defendant asserted, as a special defense, that the plaintiff was estopped from seeking a reduction in the October 1, 1987 valuation of the plaintiff's property. In its articulation, the trial court found the following facts regarding this special defense: "The action taken and the words spoken by the [plaintiff] are found in the meeting between Maddocks on behalf of the [defendant], and . . . Keating representing [the plaintiff], on October 22, 1987. That meeting included a discussion of what Maddocks had found to that date and general data about the property freely and willingly provided by [the plaintiff]. As a result of that meeting, an agreement was reached between Maddocks and Keating [that set the fair market value of the building, 99.5 acre parcel and undeveloped land at between $350,000,000 and $355,000,000]. That agreement produced an annual tax savings of . . . $600,000 . . . for [the plaintiff].

"After Maddocks was discharged by [the firm] . . . Thomas assumed his duties in November of 1987. He sent an assessment notice to [the plaintiff], which generated a complaint from Keating mid-December that year that the valuation set forth in [the] notice from Thomas was higher than the parties had agreed to in October of that year. Thomas, on behalf of the [defendant and] in reliance upon that agreement, reduced the [amount stated in the] assessment notice by . . . $10,000,000 . . . . [The plaintiff's] attempts to refute the claimed agreement were exposed as false when Keating was

presented with a document which indeed referred to the existence of that agreement. Keating's own hand lent credence to the [defendant's] claim of such an agreement and completely and thoroughly nullified [the plaintiff's] position that there was no such contract."

The plaintiff claims that the trial court improperly determined that the defendant had established its special defense of estoppel. We disagree.

Our jurisprudence regarding the doctrine of equitable estoppel is well established. In *Canfield* v. *Gregory*, 66 Conn. 9, 33 A. 536 (1895), this court stated: "The modern estoppel in pais is of equitable origin, though of equal application in courts of law. It is much more than a rule of evidence. It establishes rights: it determines remedies. An equitable estoppel does not so much shut out the truth as let in the truth, and the whole truth. Its office is not to support some strict rule of law, but to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties." Id., 17.

"Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby [the party] is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. 3 Pomeroy, Equity Jurisprudence (5th Ed. 1941) § 804, p. 189; 28 Am. Jur. 2d, Estoppel and Waiver § 76; accord *Spear-Newman, Inc.* v. *Modern Floors Corporation*, 149 Conn. 88, 91, 175 A.2d 565 (1961); *Tradesmens National Bank of New Haven* v. *Minor*, 122 Conn. 419, 424, 190 A. 270 (1937); *MacKay* v. *Aetna Life Ins. Co.*, 118 Conn. 538, 548, 173 A. 783 (1934)." (Internal quotation marks omit-

ted.) *Boyce* v. *Allstate Ins. Co.*, 236 Conn. 375, 383–84, 673 A.2d 77 (1996).

"We [have] recognized that estoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. *Bozzi* v. *Bozzi*, 177 Conn. 232, 242, 413 A.2d 834 (1979); *Dupuis* v. *Submarine Base Credit Union, Inc.*, 170 Conn. 344, 353, 365 A.2d 1093 (1976); *Pet Care Products, Inc.* v. *Barnett*, 150 Conn. 42, 53–54, 184 A.2d 797 (1962)." (Internal quotation marks omitted.) *Boyce* v. *Allstate Ins. Co.*, supra, 236 Conn. 385.

We conclude that the trial court properly determined that Keating's statements induced Thomas to believe that his predecessor, Maddocks, and Keating had agreed upon a value of the plaintiff's property that was lower than the value Thomas had established in the assessment notice that he issued to the plaintiff. Consequently, Thomas, acting on behalf of the defendant, changed his position to the defendant's detriment by reducing the value of the plaintiff's property in accordance with Keating's representations concerning the agreement, thereby reducing the amount of revenue that the defendant would derive from an assessment on the plaintiff's property. We conclude, therefore, that the plaintiff is estopped from proving that the defendant's valuation of its property is unjust. Because the plaintiff cannot prove that the valuation is unjust, the trial court properly refused to adjust the value. See, e.g., *Gorin's, Inc.* v. *Board of Tax Review*, 178 Conn. 606, 608, 424 A.2d 282 (1979) ("[o]nly when the court finds that the action of the board [of tax review] will result in the payment of an unjust and, therefore, illegal tax, can the court

proceed to exercise its broad discretionary power to grant such relief as is appropriate").

The plaintiff, relying on the doctrine of promissory estoppel, argues that, in the absence of a " 'clear and definite promise' " between the parties that reasonably could have been expected to induce reliance,[2] it is not estopped from *appealing* the October 1, 1987 valuation. The plaintiff further argues that there is insufficient evidence to support a finding of estoppel.

The plaintiff has misconstrued the trial court's decision. The trial court, in its articulation, concluded: "This court is thoroughly satisfied and finds that the [defendant], in accordance with the credible evidence [it has] offered . . . has indeed *established that special defense of estoppel which it pleaded*." (Emphasis added.) The defendant alleged, with respect to its special defense of estoppel, that "[t]he plaintiff is . . . estopped from requiring the defendant in effect to reduce the October 1, 1987 valuation of its property." The defendant did not challenge the plaintiff's right to *appeal* but, rather, the plaintiff's right to obtain a reduction in the valuation to which the plaintiff had agreed. The trial court concluded, and we agree, that the plaintiff did not waive its right to appeal. For example, if any structures on its property were to become damaged after the valuation, the plaintiff could appeal the valua-

---

[2] The plaintiff's reliance on the doctrine of promissory estoppel is misplaced. Under the doctrine of equitable estoppel, as opposed to the doctrine of promissory estoppel, proof of a clear and definite promise is unnecessary. *In re David W.*, 52 Conn. App. 576, 586, 727 A.2d 264 (1999), rev'd on other grounds, 254 Conn. 676, 759 A.2d 89 (2000) ("[t]he absence of a clear and definite promise [does] not preclude application of the doctrine of equitable estoppel"); see also 28 Am. Jur. 2d 465, Estoppel and Waiver § 35 (2d Ed. 2000) ("[p]romissory estoppel involves a clear and definite promise, while equitable estoppel involves only representations and inducements"). For purposes of our analysis in this case, we view the doctrine of equitable estoppel as the only applicable doctrine.

tion on the basis of General Statutes § 12-64a.[3] See *DeSena* v. *Waterbury*, supra, 249 Conn. 87.

We also disagree with the plaintiff's contention that the evidence was insufficient to support the trial court's

[3] General Statutes § 12-64a provides: "Reduction in assessed value of real estate upon removal of damaged buildings. Municipal option to abate tax on personal property located in damaged building. (a) Whenever a building is so damaged as to require total reconstruction before it may be used for any purpose related to its use prior to such damage and following which, the owner provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated or used as fill on such parcel for purposes of grading, such parcel shall be assessed for purposes of property tax as of the date such demolition, removal and grading are completed, to the satisfaction of the building inspector in the municipality, and such assessment shall reflect a determination of the assessed value of such parcel, exclusive of the value of the building so damaged, demolished and removed. The adjusted assessment shall be applicable with respect to such parcel from the date demolition, removal and grading are completed, as determined by said building inspector, until the first day of October next succeeding and the amount of property tax payable with respect to such parcel for the assessment year in which demolition, removal and grading are completed shall be adjusted accordingly in such manner as determined by the assessor.

"(b) Notwithstanding the provisions of subsection (a) of this section, in the case of a building that sustains fire or weather-related damage that requires the building to be totally reconstructed before it may be used for any purpose related to its use prior to the damage, the assessment reduction shall be calculated from the date of such fire or weather event if the owner, within one hundred twenty days of the fire or weather event, provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated and the parcel graded to the satisfaction of the building inspector in the municipality. If the fire or weather event occurs not more than one hundred twenty days before the next assessment date and the owner provides for such complete demolition, removal and grading to the satisfaction of the building inspector after the next assessment date and not more than one hundred twenty days after the fire or weather event, the assessment for the damaged building shall be removed for such next assessment date.

"(c) When a municipality reduces an assessment for a building pursuant to subsection (a) or (b) of this section, the municipality may, by vote of its legislative body, or in a municipality where the legislative body is a town meeting, by vote of the board of selectmen, abate all or a portion of the property tax with respect to personal property that had been located in the building. Such abatement may be allowed if the personal property was damaged as a direct result of a fire or weather event to such an extent that

conclusion that the defendant established its special defense of equitable estoppel. The trial court found that Keating and Maddocks had met and agreed orally to a certain value for the plaintiff's property. Keating's notes[4] and testimony[5] regarding the meeting confirm

the property cannot be used for any purpose related to its use prior to such fire or weather event. Any abatement provided under this subsection shall be applicable with respect to such personal property from the date of the damage to the following October first."

[4] One of the defendant's exhibits included Keating's notes from October, 1987. One entry states "project [assessment] in the 350–355 [million] range." That exhibit also included Keating's notes from December, 1987, regarding his discussions with Thomas. Those notes provide in relevant part: "Tele-[phone] Call to United Appraisal

"Question on Danbury Assessed Values

"Spoke to Dan Thomas—Harold Maddocks no longer with firm—

\* \* \*

"• Discussed over-valuation

"• Our understanding was a value of 350–355 [million] per agreement with Mr. Maddocks—

"• Call back on 12/3/87 from Mr. Thomas—United Appraisal has no problem adjusting full value back to 350–355 [million] range—

"• Will call back with actual [number]

"• Will issue revised notices

"• Field cards available after 2/1/88—when info[rmation] is turned over to City Assessor . . ."

Another page of Keating's notes in the exhibit provides in relevant part: "Tele[phone] call from Dan Thomas of United Appraisal Company—allow add[itional] depr[eciation], (i.e., from 12 [percent] to 15 [percent])" Keating then compared the original value of $362,192,850 with the revised value "per [tele]phone call" of $351,700,000 and concluded that the "overall est[imated] savings" would be $773,000.

[5] The following is an excerpt from the examination of Keating by Daniel E. Casagrande, counsel representing the defendant:

"Q. When you told Mr. Thomas that there was an agreement with Mr. Maddocks, you were referring to an agreement on value that had been reached with Mr. Maddocks in the meeting on October [22] between you and Mr. Maddocks . . . [among others], were you not?

"A. As I indicated to you at my deposition . . . it was a bad choice of words to use the word 'agreement.' It was more an understanding that we had with Mr. Maddocks based upon our meeting of October, [1987].

\* \* \*

"Q. Even though you told Mr. Thomas on December [2] that there was an agreement, you didn't mean that there was an agreement?

"A. Yes.

## both that an agreement was reached and the substance

"Q. When you used the term 'agreement' on [your] note [concerning the meeting with Mr. Thomas on December 2], your testimony is that you meant to refer to an understanding?

"A. Yes, sir.

"Q. What's the difference?

"A. Very little.

"Q. Very little?

"A. It was our understanding that, at the time we were having a discussion with Mr. Maddocks in October, that the range of a value that was being discussed was in the 350 to 355 million dollar range.

\* \* \*

"Q. What did you mean when you said it was a bad choice of words when you used the word 'agreement' on this note?

"A. Well, basically, in the one meeting with Mr. Maddocks that lasted [one] hour to [one] hour and fifteen minutes, it was just basically a discussion of a number of different points that Mr. Maddocks brought up. And then there was a discussion about a range of value and that range was in the 350 to 355 million dollar category.

"Q. That's not what you told Mr. Thomas on December [2], is it? . . .

"A. No.

"Q. You told Mr. Thomas that there was an agreement, right?

"A. That there was an understanding that there was an agreement.

"Q. Your [note] says that you told Mr. Thomas that there was an agreement. Doesn't it say that?

"A. Yes, it does say that, sir.

"Q. And that's what you told Mr. Thomas, right?

"A. Yes.

"Q. Because you wanted Mr. Thomas to believe that there was an agreement, right?

"A. No.

"Q. You—

"A. —Not really.

"Q. —didn't want him to believe there was an agreement, yes or no?

"A. No.

"Q. You didn't want him to believe there was an agreement? You wanted him to reduce the value on the notices that he sent to you, right? . . .

"A. Yes. Based upon the understanding—

"Q. Mr.—Mr. Keating, I think you can answer that question yes or no. You wanted him to reduce the value, did you not?

"A. Yes, sir.

"Q. So you told him there was an agreement, did you not?

"A. Yes, sir.

\* \* \*

"Q. And now you want this court to believe that there really was no agreement on October [22]?

of that agreement. The trial court found that, after Keating received the assessment notice from Thomas, which reflected a value of approximately $362,000,000 instead of the agreed upon value of between $350,000,000 and $355,000,000, he attempted to call Maddocks. Instead of reaching Maddocks, who no longer worked for the firm, Keating spoke with Thomas, who was unaware of the agreement between Keating and Maddocks. In reliance upon Keating's representation about the agreement, Thomas advised Keating that the revised assessment notice would reflect a value of approximately $352,000,000, which is $10,000,000 less than the value reflected in the original assessment notice. We, therefore, conclude that the evidence is sufficient to support the trial court's conclusion that the defendant had established its special defense of equitable estoppel. Accordingly, we conclude that the trial court properly dismissed the plaintiff's appeal.

The judgment is affirmed.

In this opinion the other justices concurred.

---

"A. There was no iron clad agreement. No. There was an understanding.

"Q. That's not—I'm not asking—Sir, I am not asking whether there was an iron clad agreement. My question is that you want this court to believe that there was no agreement reached at that meeting on October [22].

\* \* \*

"A. There . . . was a general agreement with regard to a range of value.

"Q. That's your testimony?

"A. Yes, sir.

\* \* \*

"Q. And when [on December 2] you represented to Mr. Thomas that there was an agreement . . . you intended [for] him to rely on that representation and reduce the value to the numbers that had been agreed on, correct?

"A. Yes."