[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding arises out of the revaluation and assessment of two properties on the grand list of October 1, 1999. In accordance with Sec.12-117a, the appellants have amended their appeals to include the grand lists of October 1, 2002 and October 1, 2001, which became applicable after the initial appeal was taken. the litigation reveals that the appellants have proceeded in accordance with the practice and procedures of challenging a valuation on any grand list. The initial process was to appeal the valuation to the city's Board of Assessment Appeals and thereafter to bring this appeal de novo in this court.
These two appeals were tried together with the consent and urging of the parties. The first property, known as 301 Main Street, is owned by the Wooster Square Development Corporation; and the second, known as Wooster Square, is owned by Three Hundred One Main St. LLC. This ownership situation presents a somewhat unique connection.[1] The two parcels, while taxed separately, present a commonality of sorts. The front building was built in 1987 by Wooster Square Development Corporation which leased the land on which it stands from one Leonard Farber. The rear building was built in 1968, and the building and lot were then owned by the same Mr. Farber. Wooster Square Development Corporation and Three Hundred One Main St. LLC are owned by many of the same individuals. The front building is a modern brick combination office structure with retail and bank offices on the first floor and professional offices on the second and third floors. The rear parcel is comprised of a large parking lot together with retail shops in the same one story building.
The square footage involved with these properties is as follows: 301 Main Street (the "rear" piece) contains twenty-one thousand ninety-nine (21,099) square feet and 2.60 acres of land; the front piece contains twenty-five thousand two hundred thirty-six (25,236) square feet with no land whatsoever. The property is zoned CLCB-General Commercial Business CT Page 11445 District, and its highest and best use is that of retail office service.
"`[I]n Ireland v. Wethersfield, 242 Conn. 550, 698 A.2d 888 (1997), we [set forth] the legal tenets governing tax appeals brought pursuant to § 12-117a. . . . [T]he trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . The trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value. . . . If the trial court finds that the taxpayer has failed to meet his burden because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone. . . . A taxpayer . . . who fails to carry [the burden of establishing overvaluation] has no right to complain if the trial court accords controlling weight to the assessor's valuation of his property.'" (Citations omitted; internal quotation marks omitted.) United CarbideCorp. v. Danbury, 257 Conn. 865, 870 (2001); citing therein Torres v.Waterbury, 249 Conn. 110, 117-18 (1999).
The city recites, and correctly so, that there are three primary methods of valuing property. These are labeled the Cost Approach, the Income Approach and the Comparable Sales Approach. The Cost Approach may be defined as estimating the market value on the basis of the property's cost of construction, reduced to reflect obsolescence and physical depreciation. The Income Approach computes the market price by estimating the present value of the future stream of net rental income a purchaser could expect to realize from an investment in the property. Finally, the Comparable Sales Approach estimates the value by adjusting the purchase price of similar properties to account for differences in size, location, construction and date of sale. It may also examine the results of a recent Arm's-Length sale of the property at issue itself. It is somewhat misleading to call the Comparable Sales Approach the Market Approach because all three approaches are designed to estimate the current market value.[2]
The appellant chose Thomas Merola of Valuation Services of Centerbrook as its appraiser. The revaluation work was undertaken by Vision Appraisal Services, the work of which was subsequently reviewed by the tax assessor of the city of Danbury. When faced with these appeals, the city retained the services of Moran and Associates, Inc. (which is currently a division of Cushman and Wakefield Valuation Advisory Services). CT Page 11446
It must be remembered that a trial court is vested with broad discretion in municipal tax appeals to determine true and actual value, and "has the right to accept so much of the expert testimony and the recognized appraisal methods which are employed as it finds applicable."John F. Epina Realty, Inc. v. Space Realty, Inc., 194 Conn. 71, 84
(1984).
The findings with respect to value as expressed by those involved with the determination thereof are as follows.[3] The Wooster Square Development Corporation property, designated as the "front parcel," which was described as a retail and office building with twenty-five thousand two hundred thirty-six (25,236) square feet of rental space, was valued at one million seven hundred fifty-nine thousand four hundred ($1,759,400) dollars by the tax assessor of the city. The appellant's appraiser, Thomas Merola, expressed an opinion of value at one million three hundred ninety thousand ($1,390,000) dollars. The city's appraiser, James J. Moran, set the value of the parcel at one million nine hundred sixty thousand ($1,960,000) dollars. It is to be remembered that Wooster Square Development Corporation owns no land and its building stands on property leased from Three Hundred One Main St. LLC.
The Three Hundred One Main St. LLC is identified as the rear building together with twenty-one thousand ninety-nine (21,099) square feet of rental space standing on two and six-tenths (2.6) acres of land. The assessor's valuation of the land and buildings is one million six hundred thirteen thousand eight hundred ($1,613,800) dollars; the appellant's appraisal is one million one hundred sixty thousand ($1,160,000) dollars; and the Moran appraisal is one million nine hundred forty thousand ($1,940,000) dollars. Each of the appraisers testified at great length and submitted their reports. The city has attacked the appellants' values, contending that they relied upon a single method of determining the worth of these properties. While the appellant's expert suggests in his report that all three methods of valuation were utilized, his testimony had finally brought forth the admission that he used one, which was the Sales Comparison Approach, because he believed that was the only one that accurately determined the value. The city's appraiser utilized all three and explained all three in great detail.
The Wooster Square Development Corporation's evidence of value strikes the court as the more accurate determination thereof. The Moran analysis, predicated upon their direct capitalization technique which was developed within their income capitalization approach, reaches the conclusion of the average rental rate often ($10) dollars per square foot rent for retail space and ten ($10) dollars per square foot net for CT Page 11447 office space. Predicated upon this approach, he arrives at the value of one million nine hundred sixty thousand ($1,960,000) dollars, as previously set forth. The appellants' expert, Merola, valued the property using the Income Approach, believing, however, that use of the Income Approach also produced unreliable valuations. The contract rents of the subject property, according to him, were above market levels; and the city's expert concurred. In the Income Approach, Merola used the gross rent of twelve ($12) dollars and expenses of one hundred fifty thousand five hundred twenty-two ($150,522) dollars to determine a net operating income of three hundred seventeen thousand nine hundred sixty ($317,960) dollars. He then capitalized that income stream with an 11.5% rate, to reach a value of two million seven hundred sixty thousand ($2,760,000) dollars. The city's expert, Moran, by contrast, chose ten ($10) dollars for retail space and office space, as aforesaid, on a net basis. His report lists numerous rents of competing properties. On that list there are more rents below the market rent he chose for the property than above it. Many are in the five ($5) dollar to seven ($7) dollar range. This highly subjective decision to use ten ($10) dollars as the market rent brings the validity of the Income Approach into question. Both the valuation company and the assessor, in using that Income Approach, used different rental rates, expense allowance and a higher capitalization rate.
It is against this backdrop that Merola's decision to rely on activity in the marketplace, that is, the Sales Approach, seemed wise to him and to the appellant. He utilized six sales in his Sales Approach, including the sale of the subject property. His sales all occurred in 1999. They all required upward adjustments.
The court, in considering the approaches of the experts as well as the assessor, is persuaded that the appellants' computation is not as compelling as the city's. The court accepts the city's articulated methodology as well as the result thereof, and finds the market value of the Wooster Square Development Corp., LLC to be one million nine hundred sixty thousand ($1,960,000) dollars.
The court finds Moran's approach to the Three Hundred One Main St. LLC to be substantially less acceptable than Merola's. This property was clearly affected by its purchase on February 26, 1998 for the sum of one million ($1,000,000) dollars. The seller in that transaction was a man named Leonard Farber. This, Merola found to be the controlling factor in his valuation and there employed the Comparable Sales Approach. Farber's introduction to David Hawley, the apparent controlling person of the two entities with which we are concerned, is somewhat interesting. It appears as though Farber and Hawley's father, had once met at Las Vegas at CT Page 11448 a convention of shopping center developers. Farber is a resident of Florida and appears to be a real estate developer. There is no relationship between him and the Hawley family, and their only commonality was commercial in the sense of the purchase and sale of developable properties. After Wooster Square constructed the building stan cling on the front piece of land leased from Farber, Hawley let it be known that his company or companies would be interested in purchasing the rear building and the land. During November and December at the end of 1997 and the beginning of 1998, the parties engaged in negotiations.[4] Wooster Square offered eight hundred fifty thousand ($850,000) dollars. Farber countered with a million two hundred thousand ($1,200,000) dollars, and on February 26, 1998, Three Hundred One Main St. LLC purchased the rear building, as aforesaid, for the price of one million ($1,000,000) dollars. After the sale of the back building and lot, Farber had no further contact with the new owners.
Depending on one's interpretation of the testimony that was presented as well as the manner in which it was presented, the city is highly critical of Merola's report with respect to this piece and the land. As previously stated, Merola's report suggests that he considered all three approaches to value, but under examination by the city's counsel, was forced to admit that he used only the Comparable Sales Approach. This the city insists is highly unreasonable and, because of his failure to use the other two systems of valuation, is inaccurate. The city's argument, however, that the trial court should ignore the appellant's appraisal because he used only one of three statutory appraisal methods ignores the fact that appellant's appraiser was not obligated to use any one method of appraisal. The directive of Sec. 12-63b applies to "[t]he assessor . . . in any town, when determining the present true and actual value of real property as provided in section 12-63. . . ." A party challenging the validity of such an appraisal is not required to follow the structure outlined in 12-63b, but is only required to provide evidence proving that the property has been over assessed. Although a trial court certainly could consider the methodology used by an appraiser in determining what weight to give the appraisal, it is not required to ignore an appraisal of a party challenging the assessment simply because it did not conform to the standards set for the town's assessor. First Bethel Associates v.Bethel, 231 Conn. 731, 743-44 (1995). The city challenges the Merola determination by insisting that this particular transaction was not an Arm's-Length transaction and is not a fair market sale. Some of the litany of reasons they list attempting to overcome the validity of Merola's value did not include related data. That data includes pertinent sales, listings, offerings, rental data as well as an appraisal, the absence of activities demonstrating that the property was exposed to the CT Page 11449 real estate market in general. Try as it may, the city finds itself in a rather precarious position with respect to this argument. The assessor's card for this property lists it as an ARM'S-LENGTH transaction. Moran's appraisal indicates that "our verification indicated this was an ARM'S-LENGTH transaction." Merola, of course, has held that position from the moment he wrote his report, if not before that time. A significant factor that has not been truly confronted by either party is the fact that these people are not inexperienced individuals when it comes to the purchase and sale of property. Each easily displays the mantle of experienced developers and/or managers. Negotiations by telephone over a period of time between two sophisticated entities tends to solidify the position that this was an "ARM'S LENGTH" transaction, and the court is convinced that indeed it was. It also should be noted that only one attempt was made to contact Farber at his Florida location to determine any particulars which were not known to the assessor or the appraiser at the time. Such a solitary effort does contribute to a successful rebuttal of the finding of an Arm's-Length transaction.
Whether or not this transaction establishes market value is another question. The term is defined in Rules and Regulations (Federal Register), Volume 55, Number 165, Page 34696 as "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and the seller each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
(1) buyer and seller are typically motivated;
(2) both parties are well informed or well advised in acting in what they consider their best interest;
(3) a reasonable time is allowed for exposure to the open market;
(4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
(5) the price represents the normal consideration for the property, sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale." There is no suggestion of a purchase money mortgage or any unique features of the transaction which suggests anything less than an Arm's-Length transaction. The weak link under the definition, of course, is the reasonable time allowed for exposure in the open market. However, the experience of the principals in CT Page 11450 transactions such as this tends to negate this shortcoming. While in theory, the definition of market value may not be established in accordance with the standards set forth in the Rules and Regulations, the overall facts prior to and flowing from this transaction leave the court to believe and to hold that the validity of the transaction is satisfactory for the purpose offered.
Merola utilized five sales ranging from $16.45 per square foot, $139.78 per square foot, $34.38 per square foot, $53.15 per square foot, and $58.23 per square foot. Those five sales have a varying degree of comparability. The sale of 345 Main Street is the most nearly comparable. Wooster Square Development Corporation leased the front building Three Hundred One St. LLC from Leonard Farber. Farber owned the rear land and the land in the front of the building as indicated.[5] Discussion with the grantee, Three Hundred One Main St. LLC, amounted to $47.86 per square foot. He assigns $55 per square foot for the one story retail building in the rear and the 2.6 acres of land. Utilizing these figures on that basis, he values the land and building at one million one hundred sixty thousand four hundred forty-five ($1,160,445) dollars, rounded off to one million one hundred sixty thousand ($1,160,000) dollars. The court is persuaded and accepts that figure as the valuation of the rear property and land.
Therefore, in accordance with the foregoing, the court finds that the first property known as Three Hundred One Main St. LLC, owned by Wooster Square Development Corporation and designated as the "front parcel," valued by the assessor at one million seven hundred fifty-nine thousand four hundred ($1,759,400) dollars with the resulting assessment of one million two hundred thirty-one thousand six hundred ($1,231,600) dollars, is not over assessed. The appellants have failed to meet their burden with respect to that parcel. However, the second property known as Wooster Square and owned by Three Hundred One Main St. LLC and designated as the "rear" parcel, and valued by the defendant's assessor at one million six hundred thirteen thousand eight hundred ($1,613,800) dollars with the resulting assessment of one million one hundred twenty-nine thousand six hundred ($1,129,600) dollars, is indeed over assessed; and the appellants have met their burden of proof with respect to that second parcel. The value of that parcel is found to be one million one hundred sixty thousand ($1,160,000) dollars, which reduces the assessment to eight hundred twelve thousand ($812,000) dollars.
The assessor is, accordingly, ordered to enter these values on the tax lists of 1999, 2000, and 2001, and to effectuate adjustments and refunds as the same may apply. CT Page 11451
_____________________ Moraghan, J.T.R.