**Earl CRAIG and Mary Gore**

v.

**COLONIAL PENN INSURANCE CO.**

**No. 3:02CV1630JBA.**

United States District Court,
D. Connecticut.

Sept. 15, 2004.

Caleb McIvor Pilgrim, New Haven, CT, for Plaintiffs.

Joel J. Rottner, Mathew Dallas Gordon, Skelley Rottner, P.C., Hartford, CT, for Defendant.

**Ruling on Defendant's Motion for Summary Judgment [Doc. # 68]; Motions to Preclude Plaintiffs from Presenting Affidavits from Plaintiff in Opposition to Motion for Summary Judgment [Docs. ## 72, 74]; Motion to Strike Unsupported Factual Allegations in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment [Doc. # 91]**

ARTERTON, District Judge.

Defendant Colonial Penn Insurance Company ("Colonial Penn") has moved for summary judgment in its favor on all counts in plaintiffs' complaint. For the reasons discussed below, defendant's summary judgment motion [Doc. # 68] is granted. Defendant's motions to preclude [Docs. # 72, 74] and motion to strike [Doc. # 91] are denied as moot.

## I. Background

This case arises out of defendant Colonial Penn's denial of plaintiffs' claim for coverage under their homeowner's insurance policy after a fire destroyed their premises. Colonial Penn issued a homeowner's insurance policy to plaintiffs Earl Craig and Mary Gore for a residence located at 90–92 Miles Street in Bridgeport, Connecticut, which by its terms incepted on August 3, 2000 at 12:01 A.M. *See* Colonial Penn Insurance Company Policy No. 614042180 [Doc. # 69, Ex. I]. A fire occurred at this property on or about August 2, 2000 at 1:15 AM, prior to the inception date of the policy. *See* Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. # 69, Ex. A]. A second fire on the same premises occurred on August 4, 2000. *See* Bridgeport Fire Department Incident Report, Aug. 4, 2000 [Doc. # 69, Ex. E]. Plaintiffs filed a claim with Colonial Penn on August 28, 2000 as a result of the August 4, 2000 fire. After an investigation, Colonial Penn denied plaintiffs claim on May 9, 2001, offering in its letter to plaintiffs' counsel ten grounds for its denial. *See* Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J].

The parties dispute some of the bases for the claim determination, including whether the plaintiffs owned the house they had insured on the dates at issue, and whether plaintiffs intentionally set the fires on the insured property. For the purposes of this summary judgment motion, however, Colonial Penn focuses on three of the bases for its denial of coverage: (1) that plaintiffs did not disclose to them the fire that occurred on August 2, 2000, prior to the inception date of the policy, in violation of the Homeowners Insurance Policy, which provides "[w]e do not provide coverage for any loss, if before or after the loss an insured has ... inten-

tionally concealed or misrepresented any material fact or circumstance;" Colonial Penn Homeowners Insurance Policy, Section I and II Conditions [Doc. # 69, Ex. D] at 39 ¶ 2; (2) that plaintiffs did not suffer a loss from the August 4, 2000 fire, because the fire that occurred two days earlier resulted in the total destruction of the premises, so that the "actual cash value of the building and contents subsequent to that loss is zero;" *See* Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J] at ¶ V; and (3) that plaintiffs did not reside at the insured premises on the inception date of the policy or on the date of loss, excepting them from coverage under their homeowners insurance policy, which provides for coverage of "[t]he dwelling on the residence premises" which is defined as "the one or two family dwelling, the other structures, and grounds or that part of any other building where you reside and which is shown as the 'residence premises' in the Declarations." *See* Colonial Penn Homeowners Insurance Policy, Section I Property Coverages [Doc. # 69, Ex. D] at 4. As to these asserted bases for denial, the following facts are relevant.

Plaintiffs' homeowners insurance policy with Colonial Penn provides that its effective date was August 3, 2000, and had a policy period covering August 3, 2000 to August 3, 2001. *See* Colonial Penn Insurance Company Policy No. 614042180 [Doc. # 69, Ex. I]. According to Colonial Penn's underwriting file, the policy incepted on August 3, 2000 upon Colonial Penn's receipt of plaintiffs' payment of premium. *See* Affidavit of Patti Tystad, Homeowner's Product Manager, Colonial Penn Insurance Company [Doc. # 69, Ex. D] at ¶ 7. Defendant's records show that plaintiffs authorized an electronic transfer of funds in a telephone conversation on August 2, 2000 with a Ms. Tony Crosby, a former Sales Representative employed by Colonial Penn. *See id.; see also* Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J] at ¶ II(B) (stating that Colonial Penn's 800 number phone records revealed "two phone calls on August 2, 2000 made from a telephone booth on Connecticut Avenue in Bridgeport very near to the insured premises," and concluding that "these telephone calls were made by the insureds.").

Plaintiff Mary Gore testified at her Examination Under Oath with Colonial Penn investigators that she first contacted Colonial Penn about purchasing homeowners insurance on July 17, 2000. *See id.* at 117. Gore testified that after talking with a Colonial Penn agent again on July 19, who informed her of the premium amount, she mailed a check to Colonial Penn on July 21, 2000 for $131.65. *See id.* at 117. According to Gore, before the first fire, she called the insurance company again by pay phone, and was informed that they had not yet received her check. *See id.* at 118, 120. Gore testified that Colonial Penn executed a withdrawal from Craig's checking account over the phone on that day. *See id.* at 118. While Gore could not recall on which day she called Colonial Penn and debited the checking account, she testified that it was "way before" the first fire. *Id.* at 118. According to Gore, she "didn't know when [Colonial Penn] was going to issue the policy." *Id.* at 132.

Colonial Penn received plaintiffs' signed application for insurance, along with a photograph of the house, on August 14, 2000, in an envelope postmarked August 7, 2000. *See* Affidavit of Patti Tystad, Homeowner's Product Manager, Colonial Penn Insurance Company [Doc. # 69, Ex. D] at ¶¶ 8–11. The application is dated July 31, 2000. *See* Examination Under Oath of Mary Gore ("Gore Examination") [Doc. # 79, Ex. B] at 124. Above the signature line, the application provides, "I understand that this policy will not be issued or

continued unless I have, one, answered all the questions, two signed and dated this application." *Id.* at 132. In addition, above Gore's signature on the application, it states "I understand that my application is subject to acceptance by Colonial Penn .... If I qualify I request the policy become effective at 12:01 a.m. __/__/__ but in no event prior to seven days following the post mark on the envelope containing my premium." *Id.* at 126. To this statement Gore added "A/S/P/," which she explained at her Examination Under Oath meant "as soon as possible," and which she wrote at the recommendation of the insurance agent. *Id.* at 125, 126.

The parties do not dispute that two fires broke out at 90–92 Miles Street in Bridgeport on August 2 and August 4, 2000. Gore testified that she did not know whether she had insurance prior to the first fire. *See id.* at 126. Plaintiffs state that at the time of the first fire, they were living in the first floor apartment at 90 Miles Street, and that their apartment was equipped with gas heat, a working furnace, and functioning plumbing facilities. *See id.* at 107. Plaintiffs intended to rent out the third floor apartment, which Gore stated was similarly equipped. *See id.* at 105–06. On the night of the August 2, 2000 fire, plaintiffs were not present at the Miles Street residence. Gore testified that she first learned that a fire had occurred at her Miles Street address on the morning of August 2, when she arrived at approximately 10:30 AM with a prospective tenant to find "a burnt house." *See id.* at 108, 120. The Bridgeport Fire Department's Incident report from August 2, 2000 indicates that the fire occurred at approximately 1:15 AM, and involved "Heavy Fire on arrival in rear interior stairwell on all 3 floors. Fire entending throughout interior of structure on all floors .... Vacant structure.... Very heavy damage in rear on all floor & cockloft area. Rear interior stairs totally

burned out." Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. # 69, Ex. A].

According to Gore, when she discovered the fire on the morning of August 2, she went to the fire department, where they took her insurance information. Although she initially believed that the fire department would file an insurance claim on her behalf, she later learned that she would need to do so on her own, whereupon she contacted an attorney to assist her. *See* Gore Examination [Doc. # 79, Ex. B] at 109, 113.

The second fire broke out on August 4, 2000. The Bridgeport Fire Department characterized this fire as a "3 story vacant house fire with heavy fire on 1st Fl. extending to 2nd Fl." Bridgeport Fire Department Incident Report, Aug. 4, 2000 [Doc. # 69, Ex. E]. Colonial Penn's records reveal that Gore reported a claim for the August 4 fire on August 28, 2000. *See* Affidavit of Michael White, Jan. 28, 2004 [Doc. # 69, Ex. I] at ¶ 6; Colonial Penn Claim Inquiry General Information [Doc. # 69, Ex. I] at 3 (giving claim inquiry date as 8/28/00 and loss date as 8/4/00). Colonial Penn asserts that no claim was made for the August 2, 2000 fire. *See id.*

Upon receipt of plaintiffs' claim, Colonial Penn began its investigation. Defendant hired Robert Nattrass, a Certified Connecticut Fire Marshall employed by Acacia Investigations, to examine the 90–92 Miles Street property. His examination found that prior to the fire, the building was not habitable because "[p]iping had been disconnected in the bathroom and the sink was completely missing. The copper water piping was missing and the plastic and iron waste piping was disconnected in the bathroom prior to the fire. The baseboard heating pipes had been removed in at least two rooms." *See* Affidavit of Robert Nattrass [Doc. # 69, Ex. B] at ¶ 17. Nattras

also found that the 90–92 Miles Street building was structurally unsound after the August 2, 2000 fire, and required demolition. *See* Affidavit of Robert Nattrass, Jan. 26, 2004 [Doc. # 69, Ex. B] at ¶ 10. Marion Guzik, a property adjuster hired by Colonial Penn to examine the premises and review the Fire Marshall's report, similarly concluded that "as a result of the fire on August 2, 2000, the building was a total constructive loss and required demolition;" that "[t]he building had no value after the August 2, 2000 fire;" and that "[t]he building was unsafe and not habitable due to extensive structural damage rendering the home a constructive total loss due to the August 2, 2000 fire." *See* Affidavit of Marion Guzik, Jan. 26, 2004 [Doc. # 69, Ex. C] at ¶¶ 7–9. Based on these findings, among others, Colonial Penn denied plaintiffs' claim for coverage on May 9, 2001. *See* Letter of Thomas P. Kelly, Regional Claims Director, Colonial Penn [Doc. # 69, Ex. J].

In the aftermath of the early August 2000 fires, plaintiffs lived for a period of time in a mobile home on the property of 90–92 Miles Street, *see* Gore Examination [Doc. # 79, Ex. B] at 141, and subsequently were homeless. Plaintiffs brought suit against Colonial Penn in Connecticut Superior Court for the Judicial District of Fairfield on August 21, 2002, alleging breach of contract, breach of covenant of good faith and fair dealing, a violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), a violation of Connecticut's Unfair Trade Practices Act ("CUPTA"), false representations, defamation, and intentional and negligent infliction of emotional distress. On September 13, 2002 defendant removed the suit to this Court as a diversity case, and now seeks summary judgment in its favor on all counts of plaintiffs' complaint.

## II. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In moving for summary judgment against a party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). In order to defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, "[w]hen a motion for summary judgment is made and supported as provided in [the

Federal Rules], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e). Instead, the party opposing summary judgment must set forth the specific facts in affidavit or other permissible evidentiary form that demonstrate a genuine issue for trial. *See id.*

## III. Discussion

### A. Breach of Contract

The Colonial Penn Homeowners Insurance Policy provides, as a condition to bringing a suit against them, that "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss." *See* Colonial Penn Homeowners Insurance Policy, Section I, Conditions [Doc. # 69, Ex. D] at 25, ¶ 8. Based on this provision, Colonial Penn argues that plaintiffs' breach of contract claims in Counts One and Two of the complaint are time barred, as plaintiffs brought suit on August 21, 2002, over two years after the date of loss, and over one year after Colonial Penn denied their claim. The Connecticut Supreme Court has long held that a contractual condition in an insurance policy requiring an action to be brought with a particular time period "is a part of the contract . . . [and] is valid and binding upon the parties." *Chichester v. New Hampshire Fire Ins. Co.*, 74 Conn. 510, 51 A. 545 (1902). Thus, plaintiffs' non-compliance with such a provision "is a complete defense, unless the plaintiff in his reply alleges facts sufficient in law to excuse his nonperformance of the condition." *See id.* at 546; *see also Bocchino v. Nationwide Mutual Fire Ins. Co.*, 246 Conn. 378, 383–84, 716 A.2d 883 (1998); *Monteiro v. American Home Assurance Co.*, 177 Conn. 281, 283, 416 A.2d 1189 (1979) (reaffirming *Chichester* ).

Plaintiffs acknowledge that they failed to comply with the policy's one-year limitations period, but argue that they should be excused from compliance under the doctrines of promissory and equitable estoppel, because Colonial Penn's denial of coverage came ten months after plaintiffs' claim was made, and defendant thereby "violated its duty to settle the Plaintiffs' claim promptly, fairly, and equitably." Plaintiffs' Memorandum of Law in Support of Plaintiffs' Opposition to Summary Judgment [Doc. # 79] at 16.

█ Under Connecticut law, any claim of estoppel, whether promissory or equitable, "is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." *Chotkowski v. State*, 240 Conn. 246, 268, 690 A.2d 368 (1997) (citations and internal quotation marks omitted); *see also Union Carbide Corp. v. City of Danbury*, 257 Conn. 865, 873, 778 A.2d 204 (2001). The doctrine of promissory estoppel requires proof of "a clear and definite promise" by a party that reasonably could have been expected to induce reliance, while the doctrine of equitable estoppel "involves only representations and inducements." *See Union Carbide Corp.*, 257 Conn. at 874 n. 2, 778 A.2d 204 (citations and internal quotation marks omitted).

█ Here, plaintiffs have not identified any evidence that would support invocation of either doctrine. While plaintiffs note that Colonial Penn took ten months to decide their claim, plaintiffs have not ar-

gued that Colonial Penn misled them by this delay into believing that the one year deadline clearly set forth in the homeowners policy did not apply. Plaintiffs' memorandum in opposition to summary judgment refers to Gore's deposition testimony "that at all times she did whatever the Defendant's agents/representatives told her to do." *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Opposition to Summary Judgment [Doc. # 79] at 16. Plaintiffs have not identified with particularity what part of Gore's Examination Under Oath is referenced.[1] The Court's review of the record has found no testimony by Gore of any representations made by Colonial Penn about how or when plaintiffs could challenge a claims determination, only that Gore completed the insurance application as Colonial Penn's agent instructed her over the phone. *See* Gore Examination [Doc. # 79, Ex. B] at 124, 134. The record before the Court, in fact, indicates that Colonial Penn informed plaintiffs that it continued to require compliance with the policy's terms. *See* Letter of Joel Rottner to Earl Craig, Oct. 4, 2000 [Doc. # 95, Ex. A] at 4 (informing Craig that an Examination Under Oath would be necessary before Colonial Penn could give further consideration to his request for payment, and stating: "In the meantime, the Colonial Penn Insurance Company respectfully continues to require full and complete compliance with all of the terms and conditions of the insurance contract and continues to reserve any and all rights and defenses which may now exist or which may arise in the future. No waiver or estoppel of any kind is intended nor should any be inferred."). Moreover, even if Colonial Penn's delay could be said to induce plaintiffs to wait to until they received Colonial Penn's determination be-

fore filing suit, the May 9, 2001 denial still left plaintiffs with approximately three months in which to file this suit before the expiration of the one-year deadline. As plaintiffs have not pointed to any evidence that would indicate that Colonial Penn induced plaintiffs into refraining from filing suit until the 12 month filing deadline had passed, the doctrine of estoppel is inapposite. Plaintiffs' breach of contract claim thus is time-barred.

**B. Bad Faith**

Count Three of plaintiffs' complaint alleges that Colonial Penn breached the contract's implied covenant of good faith and fair dealing. The landmark case of *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), first recognized a cause of action for an implied covenant of good faith and fair dealing in an insurance contract, which the court described as:

> the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.

*Id.* at 573–74, 108 Cal.Rptr. 480, 510 P.2d 1032.

As Connecticut law similarly provides, this cause of action sounds in tort. *See Buckman v. People Express, Inc.*, 205 Conn. 166, 170, 530 A.2d 596 (1987). "To constitute a breach of that covenant, the acts by which a defendant allegedly impedes the plaintiff's right to receive bene-

---

1. Plaintiffs have referenced an Exhibit R, which does not exist in the record. The Court has reviewed the portions of Mary Gore's Examination Under Oath that are included at Exhibit B.

fits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Alexandru v. Strong*, 81 Conn.App. 68, 80–81, 837 A.2d 875 (2004). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon*, 224 Conn. 231, 237–38, 618 A.2d 501 (1992) (citations and internal quotation marks omitted).

In support of their claim of bad faith, plaintiffs contend that Colonial Penn failed to pursue leads provided by plaintiffs, including that the Bridgeport Fire Department and Police Department believed others may have been involved in the arson at 90–92 Miles Street, not plaintiffs. Plaintiffs fiercely dispute Colonial Penn's accusations that they committed arson in order to collect the insurance money, and argue that "[t]hese unproven accusations were ipso facto indicative of the Defendant's bad faith." Pls.' Mem. L. [Doc. # 79] at 22.

In addition, plaintiffs state that Anthony DeBiase, owner of Anthony's Autobody and a Miles Street neighbor of plaintiffs, testified during a deposition that one of Colonial Penn's investigators discussed the fires at 90–92 Miles Street with him and referred to the Plaintiffs using a racial slur, stating that plaintiffs were trying to get something for nothing. *See* Pl.'s Mem. [Doc. # 79] at 19. The investigator's racial slur, plaintiffs contend, is evidence that Colonial Penn jumped to a false conclusion about plaintiffs' claim because of their race.

■ Plaintiffs overstate the evidentiary value of Mr. DeBiase's deposition testimony.[2] Contrary to plaintiffs' representations, Mr. DeBiase did not testify that Colonial Penn's investigator used a racial slur in referring to plaintiffs. Defendant's counsel asked Mr. DeBiase if he ever told plaintiffs about such a comment made by Colonial Penn's investigator, and Mr. DeBiase responded that he could not recall the investigator speaking to him, that it was "very possible" that Mr. Lawson made the racist comments about plaintiffs to him, but that he did not remember him making those comments.[3] Deposition

---

2. Plaintiffs did not include a copy of the deposition transcript in the summary judgment record. In response to this Court's request, defendant provided a copy of the transcript.

3. The transcript reads:

Q. I'm asking you if you specifically remember Mr. Lawson saying something to you.

A. I can't truthfully answer that because I'm still here trying to recall him. He said he spoke to me, so -

Q. Do you remember him speaking to you?

A. Truthfully, no, but he said he did.

. . . . .

Q. Now I'm asking you for a specific memory related to that. Do you remember Mr. Lawson saying—this is what the plaintiffs claim that he said to you, that they were just a couple of n——rs who had bought the house

for a dollar, insured it, and were trying to get rich overnight. Do you remember if Mr. Lawson ever said such a thing to you?

A. Very possible.

Q. I know it's possible, but do you remember that?

A. No, truthfully.

Q. Why do you say very possible?

A. Because the other guy had, from the neighborhood talk, had the property, he was stuck with it for taxes and stuff and he just had to do it, signed it over to these people. Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 18–19.

While counsel's question refers to statements made by plaintiffs about Mr. Lawson's comments to Mr. DeBiase, the summary judgment record does not include any such statements made by plaintiffs. Plaintiffs' direct testimony consists only of their Examinations Under Oath taken during Colonial Penn's investiga-

Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 19. Later, plaintiff's counsel asked Mr. DeBiase the same question, and Mr. DeBiase responded that he did not remember those comments, that he did not tell Mr. Craig about the comments, but that "anything is possible three years ago." *Id.* When asked whether he denied telling Mr. Craig about comments made by Colonial Penn's investigator, Mr. DeBiase responded, "no."[4] *Id.* Even viewed in the light most favorable to plaintiffs, Mr. DeBiase's testimony does not establish that defendant's investigator referred to plaintiffs using a racial slur. In essence, Mr. DeBiase testified that while it was possible defendant's investigator made such a comment, and, when pressed, would not deny that he told Mr. Craig about the comment, he did not remember the investigator making the comment and did not remember telling Mr. Craig about it. At best, this testimony amounts to a non-denial of a fact nowhere in evidence. Questions by counsel are not evidence, and a witness's non-denial does not create a genuine issue of material fact when the witness has testified to a lack of memory and no affirmative evidence has been introduced. *See, e.g. Celotex Corp. v. Catrett,* 477 U.S. 317, 322–

23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that moving party may meet burden of establishing that there is no genuine issue of material fact by pointing to the absence of evidence to support the non-moving party's claim, and finding "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."); *see also FDIC v. National Union Fire Ins. Co.,* 205 F.3d 66, 75 (2d Cir.2000) (where party bears burden of proof at trial, "vague denials and memory lapses ... do not create genuine issues of material fact.").

▪ ██ Moreover, even accepting the "possibility" Mr. DeBiase's testimony left open a "sinister motive" or "dishonest purpose," *see Carroll v. Allstate Ins. Co.,* 262 Conn. 422, 445 (2003) (finding that reference by defendant insurer's investigator to plaintiff as "a black man and a 'son of a bitch'," "could have led the jury to find that the plaintiff's race might have played a role in the defendant's conclusion of arson"), such evidence is insufficient to establish a breach of the implied covenant of good faith and fair dealing where, as here, the insurer's claim determination is other-

---

tion. No depositions of plaintiffs were taken as part of this lawsuit, and no affidavits were submitted. This Court sanctioned plaintiffs for failing to appear at depositions Colonial Penn scheduled on multiple occasions by precluding plaintiffs' further testimony, unless their depositions were taken. *See* Endorsement Order, Dec. 19, 2003 [Doc. # 62].

4. The deposition transcript reads as follows:

Q. Attorney Rottner raised with you the question whether or not a statement by Mr. Craig and Ms. Gore wherein Mr. Lawson said that Mr. Craig and Ms. Gore were just a couple of n——rs trying to buy a house for a dollar and burn it down and get the insurance money, do you remember that?

A. No I don't, but -

Q. He raised that question with you.

A. He asked me about it. I don't know.

Q. You said possibly?

A. If I did, if I remembered it, I would tell you, but I don't remember that.

Q. Isn't it true that you told Mr. Craig that Mr. Lawson made that comment?

. . . . .

A. No.

. . . . .

Q. When you said possibly at first -

A. Possibly what?

Q. Just in response to Attorney Rottner's question.

A. Anything is possible three years ago.

Q. Okay. So you did not deny the fact that you told that to Mr. Craig, did you?

A. No.

Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 52.

wise fully justified by the policy terms. *See, e.g. Alexandru*, 81 Conn.App. at 80–81, 837 A.2d 875. Evidence of a motive to act unreasonably is a necessary but not sufficient condition to proof of a bad faith claim. What plaintiffs have failed to produce on summary judgment is evidence that Colonial Penn in fact breached its duty to the insured by acting unreasonably or contrary to the policy provisions, or that plaintiffs could reasonably expect to receive approval of their claim.[5] Colonial Penn's finding that plaintiffs intentionally set the fire to the premises, which plaintiffs vigorously dispute, was but one of ten separate grounds on which Colonial Penn denied their claim. As to two grounds on which Colonial Penn relies at this summary judgment stage, this Court finds there is no genuine dispute of material fact.

First, the Court concludes that there is no genuine dispute that plaintiffs' homeowners insurance policy incepted on August 3, 2000. It is undisputed that by its terms, the policy inception date was August 3, 2000. Plaintiffs' expert adjuster, Wesley Robinson, testified at his deposition that he believed plaintiffs were insured from the time of their closing on the property (which here is claimed to be June 28, 2000)[6], because "typically when you have a closing with attorneys representing you, attorneys typically make sure that there is insurance on the property especially if there's a mortgage instrument in place." Deposition of Wesley Robinson, June 19, 2003 [Doc. # 79, Ex. V] at 22. This testimony does not create a material dispute as it expresses no personal knowledge about what actually happened here, where no mortgage is claimed to exist, and as plaintiffs have not claimed to have insurance at the time of closing. *See* Gore Examination [Doc. # 79, Ex. B] at 117 (testifying that she first contacted Colonial Penn about obtaining insurance on July 17, 2000). Further, Gore's testimony during her Examination Under Oath that she spoke with a Colonial Penn agent who debited Craig's checking account "way before" the first fire does not create a dispute as to the policy inception date when Gore also testified that she was told the policy had not begun at the time of her

---

5. Plaintiffs' reliance on *United Technologies Corp. v. American Home Assurance Co.*, 118 F.Supp.2d 181 (D.Conn.2000), in which this Court concluded that "procedural bad faith" claims were cognizable under Connecticut law, is inapposite, as plaintiffs here have not identified any facts supporting a conclusion of procedural bad faith. While plaintiffs argue that Colonial Penn's delay in deciding the claim was unreasonable, they have not specified why they claim this delay was unreasonable. In the absence of such facts, plaintiffs cannot prevail on their bad faith claim. *See id.* at 187 (citing *McCauley Enterprises, Inc. v. New Hampshire Ins. Co.*, 716 F.Supp. 718 (D.Conn.1989)). The record before this Court reveals that Colonial Penn's investigation began shortly after the claim was filed, and was comprehensive in that investigators interviewed plaintiffs and their neighbors informally and under oath, and experts, including a Certified Fire Marshall and a property adjuster, examined the property and the rele-

vant records. The record reveals an investigation that was ongoing throughout the period from August 28, 2000 to May 9, 2001, when Colonial Penn formally denied plaintiffs' claim. *See, e.g.* Affidavit of Robert Nattrass, Jan. 20, 2004 [Doc. # 69, Ex. B] (stating examination of structure was performed on September 27, 2000); Affidavit of Marion Guzik, Jan. 23, 2004 [Doc. # 69, Ex C] (stating that examination of premises occurred on September 28, 2000); Letter of Joel J. Rottner to Earl Craig, October 4, 2000 [Doc. # 95, Ex. A] (stating that Examination Under Oath was necessary before Colonial Penn would consider claim further); Examination Under Oath of Mary Gore ("Gore Examination"), Dec. 4, 2000 [Doc. # 79, Ex. B]; Examination Under Oath of Earl Craig, Feb. 21, 2001 [Doc. # 69, Ex. G].

6. *See* Gore Examination, Dec. 2, 2000 [Doc. # 79, Ex. B] at 7.

phone call and that she did not know when the policy incepted. *See id.* at 118.

It is similarly undisputed that the fires on the premises occurred on August 2 and August 4, 2000, and that plaintiffs filed a claim on August 28, 2000 for only the August 4 fire. *See* Bridgeport Fire Department Incident Report, Aug. 2, 2000 [Doc. # 69, Ex. A]; Bridgeport Fire Department Incident Report, Aug. 4, 2000 [Doc. # 69, Ex. E]; White Aff. [Doc. # 69, Ex. I] at ¶ 6; Colonial Penn Claim Inquiry General Information [Doc. # 69, Ex. I] at 3. Plaintiffs acknowledge that they were aware of the August 2, 2000 fire at the time they filed their claim, as Gore testified that she arrived at the house on the morning of August 2, 2000 to find that "a burnt home," and as the Fire Department Incident Reports were provided to Earl Craig on August 7, 2000. *See id.* Plaintiffs do not dispute that they did not reside on the premises after the August 2, 2000 fire.[7]

Moreover, while plaintiffs deny in their pleadings defendant's conclusion that the August 2, 2000 fire rendered the 90–92 Miles Street property a "constructive total loss," they have not set forth any specific facts or pointed to any evidence that creates a genuine dispute about this conclusion. Defendant's property adjuster, after reviewing the Fire Marshall's report and examining the premises, concluded that "[t]he building had no value after the August 2, 2000 fire;" and that "[t]he building was unsafe and not habitable due to extensive structural damage rendering the home a constructive total loss due to the August 2, 2000 fire." *See* Guzik Aff. [Doc. # 69, Ex. C] at ¶¶ 7–9. In response, plaintiffs

point to zoning permit issued by the City of Bridgeport on January 29, 2001, after both fires, which plaintiffs claim demonstrates that even after the second fire the building was not a total constructive loss requiring demolition, and instead needed only "repairs." The permit application belies plaintiffs' assertion. The application signed by Earl Craig describes the work to be done as "repair fire damage—walls, ceilings, floors, stairs, etc." *See* Application For Certificate of Zoning, Jan. 29, 2001 [Doc. # 79, Ex. C]. The permit further provides that the work intended is to "replace walls, ceilings, stairs, floors, etc." *See id.* at 2. As the application acknowledges the need to "replace" the walls, ceilings, stairs, and floors of the building, it supports rather than contradicts defendant's expert opinion that the building was a constructive loss. Plaintiffs have presented no evidence demonstrating that the building did not become a constructive loss until the August 4, 2000 fire. Plaintiffs' adjuster, Wesley Robinson, stated during his deposition testimony that at the time he examined the property, his "understanding was that I was under the premise that there was just one fire." *See* Deposition of Wesley Robinson, June 19, 2003 [Doc. # 79, Ex. V] at 17. As a result, he stated that was not able to make any effort to distinguish what was lost in one fire versus the other fire. *See id.* The deposition testimony in the record before the Court expresses no opinion about the nature of the damage to the property after either fire. Defendant's evidence thus remains uncontroverted.

Based on the above facts, the Court concludes that Colonial Penn acted in ac-

---

**7.** While the parties dispute whether plaintiffs resided on the premises prior to the first fire, as plaintiffs testified during their Examinations under Oath that they lived there, and presented utility bills for the premises, and defendant's experts submitted affidavits stating that the building lacked plumbing, heat, and hot water, this issue is not material in light of the August 3, 2000 policy inception date. *See, e.g.* Affidavit of Robert Nattrass [Doc. # 69, Ex. B] at ¶ 17; Gore Examination [Doc. # 79, Ex. B] at 105–07.

cordance with its policy terms in denying plaintiffs coverage based on their material misrepresentation in not informing Colonial Penn of the August 2, 2000 fire, and based on a loss amount of zero for the August 4, 2000 fire. *See* Colonial Penn Homeowners Insurance Policy, [Doc. # 69, Ex. D] at 39 ¶ 2 (Section I and II Conditions).[8] Plaintiffs' bad faith claim is therefore unavailing.

## C. CUIPA and CUPTA

Counts Four and Five of plaintiffs' complaint allege violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUPTA"). Plaintiffs' CUIPA claim alleges that Colonial Penn engaged in unfair claim settlement practices by "misrepresenting pertinent facts and insurance policy provisions;" "[f]ailing to acknowledge and act with reasonable promptness;" "[f]ailing to adopt and implement reasonable standards for the prompt investigation and resolution of claims;" "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;" "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims;" and "[r]efusing to pay the Plaintiffs insured." *See* Complaint [Doc. # 1] at ¶ 18.

■ While there is some conflict among Connecticut courts as to whether there is a private right of action under CUIPA, it is generally accepted, at minimum, that a plaintiff may use CUPTA as a vehicle to bring a claim for unfair settlement practices under CUIPA. *See Macomber v. Travelers Property & Casualty Corp.*, 261

Conn. 620, 645 & n. 14, 804 A.2d 180 (2002) (permitting plaintiffs to assert a CUPTA violation based on CUIPA, even where CUIPA count was pleaded as a stand alone claim, and therefore not addressing argument that there is no private right of action under CUIPA); *Mead v. Burns*, 199 Conn. 651, 663, 509 A.2d 11 (determining that it is possible to state a cause of action under CUPTA for a violation of CUIPA). Moreover, although insurance practices are regulated under both CUPTA and CUIPA, a "CUPTA claim must be consistent with the regulatory principles established in the underlying [insurance] statutes." *Mead*, 199 Conn. at 665, 509 A.2d 11. Accordingly, this Court will consider both the CUPTA and CUIPA counts together.

Under CUPTA as under CUIPA, "isolated instances of unfair insurance settlement practices" are not cognizable. *Id.* at 666, 509 A.2d 11. CUIPA prohibits insurers from "[c]ommitting or performing with such frequency as to indicate a general business practice" a variety of unfair or deceptive claims settlement practices. *See* Conn. Gen. St. § 38a–816(6). Thus, as the Connecticut Supreme Court has construed this provision, "claims of unfair settlement practices ... require a showing of more than a single act of insurance misconduct." *Id.* at 659, 509 A.2d 11.

■ Colonial Penn argues that plaintiffs have failed to set forth any evidence from which a reasonable jury could find a "general business practice" of unfair claims settlements. In opposition, Colonial Penn identifies two facts. First, Colonial Penn references two published cases showing

---

**8.** The third ground relied on Colonial Penn in its summary judgment motion is that the property was not a "residence premise" from the date of policy inception to the date of loss. *See* Colonial Penn Homeowners Insurance Policy, [Doc. # 69, Ex. D] at 4 (Section I Property Coverages). Because the Court finds the first two bases independently sufficient to support Colonial Penn's denial of coverage, it need not reach the issue of whether property could be deemed a "residence premise."

that Colonial Penn has been sued for unfair claim settlement practices. *See McGeouch v. Colonial Penn Ins.*, No. C–92–343–L, 1994 WL 260684 (D.N.H. April 7, 1994); *Eveleno v. Colonial Penn Ins.*, 188 Misc.2d 454, 728 N.Y.S.2d 907 (2001). The two cases cited are not evidence of a general business practice of unfair claims settlement, as *McGeouch* finds no wrongdoing and merely denies the insurer's motion for summary judgment given the factual disputes in the case, *see McGeouch*, 1994 WL 260684, at * 2, and *Eveleno* finds a violation of a New York statute requiring a response by the insurer within 15 days after receipt of proof of loss—a statutory violation that is not at issue here, *see Eveleno*, 188 Misc.2d at 456, 728 N.Y.S.2d 907.

Plaintiffs also points to a newspaper article ranking Colonial Penn as the second worst homeowners insurance company in California in 1993, as measured by a survey of complaints made to the California Department of Insurance.[9] *See Garamendi's 'Good, Bad and Ugly' Annual Report Highlight State's Best and Worst Auto, Homeowners and Life Insurers; Study Based on 1992 Consumer Complaints*, Business Wire, Oct. 21, 1993 [Doc. # 79, Ex. X]. This news article, aside from being inadmissible evidence itself, is not shown to have relevance to the case at hand, as the article does not describe the nature of the complaints against the insurers. While plaintiffs state in their memorandum in opposition that they have requested copies of all similar complaints against Colonial Penn filed with the Connecticut Department of Insurance over the past three years, the Court notes that discovery closed before summary judgment was sought, and plaintiffs never brought to the

Court's attention any difficulty in timely obtaining such documents within the discovery period. Moreover, in the several extensions of time for filing their opposition, plaintiffs never raised their need for such documents to respond to defendant's motion. In the absence of any evidence in the record of a pattern of unfair claims settlement practices by Colonial Penn, plaintiffs' CUIPA and CUPTA claims fail.

**D. Intentional and Negligent Misrepresentation**

■ Counts Six and Seven of plaintiffs' complaint allege that Colonial Penn intentionally and/or negligently made misrepresentations to plaintiffs. Plaintiffs complaint fails to identify with particularity any of the circumstances alleged to constitute fraud. Colonial Penn thus argues that plaintiffs fail to satisfy the pleading standard under Fed.R.Civ.P. 9(b). In this Circuit, "when a complaint charges fraud, it must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent." *Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275 (2d Cir.1998) (citation and internal quotation marks omitted). Plaintiffs' complaint is clearly deficient under this standard, as Counts Six and Seven merely incorporate the first 16 paragraphs of plaintiffs' complaint, which do not identify any claimed fraudulent statements, and concludes, without any specificity as to the time, place, speaker, or content of the alleged misrepresentations that Colonial Penn knew or should have known that its representations were false, and that Plaintiffs would reasonably

---

9. The Business Wire article, datelined Los Angeles, references a state Department of Insurance Report issued by Insurance Commissioner John Garamendi. The Court takes judicial notice that John Garamendi is Commissioner of the California Department of Insurance.

rely upon its representations. *See* Complaint [Doc. # 1] at Counts Six, Seven ¶ 17.

 Even if plaintiffs could survive the stringent pleading standard of Fed. R.Civ.P. 9(b), the evidence plaintiffs identify is insufficient to survive summary judgment on the substantive intentional and negligent misrepresentation claims. To prove a claim for intentional misrepresentation, plaintiffs must show: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811 (1981) (citations omitted). A negligent misrepresentation is actionable even if the declarant did not know it to be untrue "if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Updike, Kelly and Spellacy, P.C. v. Beckett*, 269 Conn. 613, 643, 850 A.2d 145 (2004) (citations and internal quotation marks omitted). In their opposition to summary judgment plaintiffs cite generally to their testimony during the Examinations Under Oath, which they summarize in their memorandum of law as stating that Colonial Penn's agents represented that "there was coverage, and that they would honor their obligations under the policy, and pay the plaintiffs in the event of losses such as the Plaintiffs suffered on August 2, 2000 and August 4, 2000." *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Opposition to Summary Judgment [Doc. # 79] at 26–27. The Court's review of plaintiffs' testimony does not reveal any claimed misrepresentation by defendant about the date of policy inception or the existence of coverage for the August 2, 2000 fire. In fact, Gore testified that she did not know when the insurance policy would be issued. *See* Gore Examination [Doc. # 79, Ex. B] at 130–133. The evidence in the record demonstrates no

more than that Colonial Penn agreed to provide coverage in accordance with the policy terms, and that Colonial Penn determined that plaintiffs were excluded from coverage under the terms of the policy. On the facts in the record, there is no basis for plaintiffs' claims of negligent and intentional misrepresentation in Counts Six and Seven.

### E. Intentional and Negligent Infliction of Emotional Distress

Count Nine of Plaintiffs' complaint alleges intentional and negligent infliction of emotional distress. To prevail on a claim of intentional infliction of emotional distress, plaintiffs must establish the following four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119 (2003) (citations and internal quotation marks omitted). "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society.... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Id.*

A claim of negligent infliction of emotional distress, in turn, must satisfy the following elements: "(1) the defendant's

conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of plaintiff's distress." *Id.* at 444, 815 A.2d 119.

In resolving this claim, this Court is guided by the Connecticut Supreme Court's decision in *Carrol,* 262 Conn. at 444, 815 A.2d 119. In *Carrol,* the Connecticut Supreme Court, reviewing a judgment for the plaintiff after a jury trial, concluded that an insurance investigation, even where it is hasty, incomplete, and ill-reasoned, or where it improperly concluded that a fire had been deliberately set, is simply "not so atrocious as to trigger liability for intentional infliction of emotional distress." *Id.* at 444, 815 A.2d 119. Nonetheless, the Court concluded that the jury reasonably could have found that "the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable," sufficient for a claim of negligent infliction of emotional distress, where "the defendant's arson investigation had been hasty, incomplete and ill-reasoned;" and "the plaintiff's race might have played a role in the defendant's conclusion of arson." *Id.* at 445, 448, 815 A.2d 119.

■ Here, as in *Carrol,* plaintiffs have not set forth evidence from which a jury could reasonably conclude that Colonial Penn's conduct in investigating and denying their claim was extreme and outrageous. While plaintiffs have characterized Anthony DiBiase's deposition testimony as stating that defendant's investigator referred to plaintiffs using a racial slur, as discussed above, the Court's review of the transcript reveals at best that Mr. DeBiase testified that he did not recall speaking to Colonial Penn's investigator or informing Mr. Craig that the investigator used a racial slur, but that "anything is possible" and he would not deny it was said. *See* Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 19, 52. Mr. DeBiase's testimony is not evidence that a racial slur was used in plaintiffs' presence, and plaintiffs have presented no affirmative evidence to support this claim.[10] In the absence of such evidence, plaintiffs' emotional distress claim is wholly unsupported.

■ Moreover, as to plaintiffs' claim of negligent infliction of emotional distress, the facts here are distinguishable from *Carrol,* in that Colonial Penn, as discussed in Part III.B, had reasonable grounds to deny plaintiff's claim, and in that plaintiffs have failed to identify with any specificity why they claim Colonial Penn's investigation was procedurally unfair. Where, as here, there are undisputed grounds permitting Colonial Penn to deny plaintiffs' insurance claim, plaintiffs cannot establish a claim for negligent infliction of emotional distress.

### F. Defamation

Count Eight of plaintiffs' complaint alleges defamation on grounds that Colonial Penn falsely accused plaintiffs of committing arson. A defamation statement is defined as "that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him." *Lowe v. City of Shelton,* 83 Conn.App. 750, 765–66, 851 A.2d 1183 (Conn.App.2004). A claim of defamation requires "that the defendant[ ] published false statements that harmed the [plaintiffs], and that the defen-

10. *See supra* note 3.

dant[ ][was] not privileged to do so." *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 27, 662 A.2d 89 (1995). Thus, "to establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004).

Some categories of defamatory speech are deemed actionable "per se" because "the defamatory meaning of [the speech] is apparent on the face of the statement...." *Battista v. United Illuminating Co.*, 10 Conn.App. 486, 491–92, 523 A.2d 1356, *cert. denied*, 204 Conn. 802, 803, 525 A.2d 1352 (1987). Accusations of a committing a crime of moral turpitude, a category in which arson would qualify, are deemed actionable *per se*, and injury is assumed. *See Miles v. Perry*, 11 Conn. App. 584, 601–602, 529 A.2d 199 (1987); *DeVito v. Schwartz*, 66 Conn.App. 228, 234, 784 A.2d 376 (2001).

Here, defendants argue and the Court agrees that the May 9, 2001 letter sent by Colonial Penn's Regional Claim Director, Thomas P. Kelly, to plaintiffs' counsel, which in the process of informing plaintiffs of the reasons for denial of the claim accused plaintiffs of intentionally setting fire to their house, does not constitute "publication" of a defamatory statement. *See Cweklinsky,* 267 Conn. at 218, 837 A.2d 759 (concluding that "[a]s a general rule, ... no action for defamation exists if the defendant publishes the defamatory statements to only the plaintiff, and the plaintiff subsequently disseminates the statements to a third person" and rejecting doctrine of "compelled self-publication defamation").

Plaintiffs' only claim of publication is the statement purportedly made by defendant's investigator, Tim Lawson, to Anthony DeBiase, referring to plaintiffs using a racial slur and accusing plaintiffs of trying to buy a house for $1.00 and burn it down in order to collect insurance money. As the Court has concluded above, plaintiffs mischaracterize Anthony DeBiase's deposition transcript, and have presented no other evidence that such a statement was ever made to Mr. DeBiase or anyone else. Mr. DeBiase testified that he did not remember meeting Colonial Penn's investigator and did not remember the investigator making such comments. *See* Deposition Transcript of Anthony DeBiase, Sept. 25, 2003 [Doc. # 98] at 19, 52. Because there is no evidence in the record that defendants published their accusations of arson against defendants to a third party, plaintiffs cannot support an essential element of their defamation claim.

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment [Doc. # 68] is hereby GRANTED on all counts of plaintiffs' complaint. As plaintiffs have not submitted affidavits in their names, defendant's Motions to Preclude Plaintiffs from Presenting Affidavits from Plaintiff in Opposition to Motion for Summary Judgment [Docs. ## 72, 74] are denied as moot. In light of this Court's summary judgment ruling, defendant's Motion to Strike Unsupported Factual Allegations in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment [Doc. # 91] is also denied as moot. The Clerk is directed to close this case.

IT IS SO ORDERED.